Steven B. Feigenbaum (SF-1711)
LEVI LUBARSKY & FEIGENBAUM LLP
1185 Avenue of the Americas, 17th Floor
New York, New York  10036
(212) 308-6100
Attorneys for Plaintiffs
Houlihan, Lokey, Howard & Zukin, Inc. and
HLHZ Investments, LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

HOULIHAN, LOKEY, HOWARD & ZUKIN, INC.
and HLHZ INVESTMENTS, LLC,                                           Case No.

                                          Plaintiffs,

                        -against-                                                        COMPLAINT

KENNETH A. WASIK,

                                          Defendant.

_____


       Houlihan, Lokey, Howard & Zukin, Inc. ("Houlihan") and HLHZ Investments,

LLC ("HLHZ"), by their attorneys, Levi Lubarsky & Feigenbaum LLP, for their complaint

against defendant Kenneth A. Wasik ("Wasik"), allege as follows:

NATURE OF THE ACTION

       1.     By this action, Houlihan, an international investment bank, seeks redress

for various contractual breaches and tortious acts by Wasik, a former Managing Director of

Houlihan and former head of its consumer products group who resigned from the company

effective May 21, 2007.  During the weeks before his resignation, Wasik misappropriated vast

amounts of confidential proprietary information of Houlihan's, undermined Houlihan's

relationship with two of its significant clients, and sought to divert corporate opportunities of

Houlihan's to his new employer, Jefferies & Company, Inc. ("Jefferies"), an investment bank that directly competes with Houlihan in the provision of investment banking services. As if that were not enough, before his departure from Houlihan, Wasik also actively encouraged existing Houlihan employees, including several members of Houlihan's financial staff, to leave Houlihan and join him at Jefferies.

        2.      By any objective standard, Wasik's acts constitute blatant violations of his contractual and fiduciary obligations to Houlihan. Moreover, his downloading of Houlihan's proprietary information, and transfer of that information to his own personal computer, constitutes a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. Despite Houlihan's efforts to resolve the matter with Wasik without judicial intervention -- including six weeks negotiating a settlement agreement that Wasik rejected at the last minute, when the agreement was ready to be signed -- no such resolution was reached. All the while, Wasik has been working for Jefferies without relinquishing any of the proprietary information he took from Houlihan, and without any constraints on his pursuit of certain business opportunities that were developed while he was still employed by Houlihan and using Houlihan's resources.

        3.      Houlihan accordingly seeks a temporary restraining order and preliminary and permanent injunctive relief (i) compelling Wasik to return immediately to Houlihan all of the documents and other information that he took from the company; (ii) granting Houlihan's computer forensics expert immediate access to the personal computer to which he sent himself Houlihan's proprietary information, thereby enabling the expert to expunge the information; (iii) preventing Wasik from using the misappropriated property, and any other proprietary information of Houlihan's, in any way; (iv) preventing Wasik from disclosing any of Houlihan's proprietary information to Jefferies or any other third parties; (v) prohibiting Wasik from

pursuing corporate opportunities with Houlihan's existing and prospective clients with which Wasik dealt while he was employed by Houlihan or about which he has confidential and proprietary information obtained from Houlihan; and (vi) prohibiting Wasik from soliciting Houlihan's employees.

4.      Houlihan also seeks damages arising from Wasik's disruption of two separate client engagements on which Wasik worked during his final months at Houlihan. By faithlessly, and falsely, maligning Houlihan to the clients and otherwise performing in such a way as to undermine the clients' relationships with Houlihan, Wasik caused Houlihan to lose one of the clients and to have to accept significant unfavorable modifications in the terms of the engagement letter with the other. Houlihan's damages are recoverable under principles of breach of fiduciary duty and duty of loyalty, misappropriation of corporate opportunities, and tortious interference with contractual relations.

5.      Houlihan seeks further damages under the faithless servant doctrine in the form of reimbursement for all compensation it paid to Wasik after he first engaged in acts of disloyalty to the company. For its 2006 fiscal year, which due to a change in its fiscal year-end covered the fifteen-month period between January 1, 2006 to March 31, 2007, Houlihan paid Wasik more than $1.5 million, of which more than $1.3 million was paid in cash as a bonus on April 30, 2007. Depending on when Wasik is found in discovery to have first breached his duty of loyalty to Houlihan, the damages to which Houlihan is entitled could be substantial.

6.      Houlihan and plaintiff HLHZ, an affiliate of Houlihan's, also seek damages for Wasik's failure to pay the balance of principal and interest on two separate promissory notes that Wasik issued to HLHZ, and on one that he issued to Houlihan, for loans that the companies had made to him. One of those notes, by its terms, became due and owing on

- 3 -

April 30, 2007, and the other two became due and owing upon Wasik's resignation from Houlihan on May 21, 2007. As of August 2, 2007, the combined balance on the notes was $483,178.19, none of which Wasik has paid.

       7.     Finally, Houlihan is contractually entitled to its attorneys' fees incurred in enforcing Wasik's contractual obligations to maintain the confidentiality of Houlihan's proprietary information and not misappropriate Houlihan's corporate opportunities or otherwise act in ways inimical to Houlihan's business interests. Both Houlihan and HLHZ are entitled to their attorneys' fees and other costs incurred in collecting the monies due them under Wasik's three promissory notes.

JURISDICTION AND VENUE

       8.     This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 over plaintiff Houlihan's federal statutory claim.

       9.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a), since the dispute is between citizens of different states and the amount in controversy exceeds $75,000.

      10.    This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over plaintiffs' state law claims.

      11.    Venue is properly laid in this judicial district under 28 U.S.C.§ 1391(b)(2), since a substantial part of the events or omissions giving rise to this action occurred in this district.

PARTIES

      12.    Plaintiff Houlihan is a corporation organized under California law with its principal place of business at 1930 Century Park West, Los Angeles, California 90067.

Houlihan also has a large office at 245 Park Avenue in New York City. Plaintiff HLHZ is a California limited liability company and is an affiliate of Houlihan's.

13.    Upon information and belief, defendant Wasik is a citizen of New Jersey, residing at 68 Prospect Street, Madison, New Jersey 07940. Before resigning from Houlihan effective May 21, 2007, Wasik was a Managing Director of Houlihan and worked out of Houlihan's New York office.

FACTUAL ALLEGATIONS

A.    Houlihan's Business

14.    Houlihan is an international investment bank that provides a wide range of financial services to more than 1,000 clients worldwide, ranging from closely held companies to Global 500 corporations. In 2006, Houlihan ranked as the top mergers and acquisitions advisor in the country for U.S. transactions under $1 billion, as measured by number of transactions. Houlihan is also among the top investment banks providing fairness opinion advice on mergers and acquisitions, and has one of the largest global financial restructuring practices of any investment bank.

15.    Among the M&A services that Houlihan provides are advising clients (primarily sellers) in the development and formulation of merger, acquisition and divestiture strategies; identifying potential buyers or acquisition targets; establishing valuation criteria and ranges; arranging acquisition financing for buyers, consisting of all types of debt and equity; structuring and negotiating transactions; identifying prospective equity and joint venture partners, and working with such partners to create the necessary arrangements to consummate each transaction; structuring internal M&A transactions, including management and employee buyouts; identifying, screening and initiating discussions with potential buyers or sellers;

assisting in the preparation of confidential information and selling memoranda; and coordinating legal, tax, accounting and other closing-related activities.

16.     In providing those and related services, Houlihan relies upon its investment bankers' in-depth knowledge of Houlihan's clients' acquisition and divestiture objectives, and the bankers' numerous close relationships with active domestic and international buyers, lenders and other institutions.  Houlihan directly competes with multiple other firms for investment banking services, including Jefferies.

B.     Wasik's Employment at Houlihan and His
       Contractual Obligations to the Company

17.     Wasik was hired by Houlihan on or about May 1, 2003 to work in its New York office.  During his tenure at Houlihan, Wasik was named the head of Houlihan's consumer products group, which encompasses essentially all industries selling consumer products other than the food and beverage industries.  Wasik held that position until approximately February 2007.  At that time, his position was restructured, and his focus was narrowed to a subset of consumer businesses involving personal care products and household goods.  Wasik served principally as an advisor to companies that were seeking to be sold, and to a lesser extent companies that were seeking to buy consumer companies.

18.     At the time he was hired by Houlihan, Wasik executed a Proprietary Information and Developments Agreement with Houlihan (the "Agreement") setting forth, among other things, the terms under which he would be permitted to utilize Houlihan proprietary information and his obligation to maintain the confidentiality of that information.  The Agreement defined "Proprietary Information" as follows:

> Proprietary Information.  For purposes of this Agreement,
> "Proprietary Information" means information that (a) is not known
> by actual or potential competitors of the Company [i.e. Houlihan]

or is generally unavailable to the public, (b) has been created, discovered or developed by, or otherwise become known to, the Company (including confidential information regarding the Company's clients or prospective clients) or in which property rights have been assigned or otherwise conveyed to the Company, and/or (c) has material economic value or potential material economic value to the Company. . . .

19.    The Agreement required that Wasik maintain Houlihan's proprietary

information in the strictest confidence.  It stated:

Nondisclosure of Proprietary Information.  At all times, both during my [Wasik's] employment and after the cessation of my employment . . . I shall (a) keep in confidence all Proprietary Information, and (b) not disclose or use, or assist in the use or disclosure of, Proprietary Information, except as may be necessary in the legitimate and ordinary course of performing my duties as an employee of the Company, without the Company's prior written consent.

20.    The Agreement further required that Wasik, while employed by Houlihan,

not engage in activities in competition with the company.  It stated:

Conflicting Employment; Business Opportunities.  During my employment, I shall (a) not directly or indirectly engage in any employment, consulting, or other business activity in competition with the Company, (b) promptly disclose to the Company all business opportunities that are (i) presented to me in my capacity as an officer or employee of the Company, and (ii) of a similar nature to the Company's existing business or a type of business the Company is currently developing, and (c) not usurp or take advantage of any such business opportunity without first offering such opportunity to the Company.

21.    The Agreement also obligated Wasik, upon his termination from

Houlihan, not to take any of the company's proprietary information:

Termination of Employment.  Upon termination of my employment for whatever reason, I shall neither take nor allow a third party to take, and I shall deliver to the Company, all original copies and all reproductions of all Proprietary Information, including, without limitation, all records, reports, notebooks, proposals, client lists, correspondence, documents, computer diskettes, notes, tapes or other electronic recordings, programs,

data, or other materials or property of any nature belonging to the
Company or pertaining to my work with the Company. . . .

22.     The Agreement also contains provisions for injunctive relief and

attorneys' fees, stating:

> If I [Wasik] breach (or threaten to breach) this Agreement, the Company
> shall be entitled to enjoin such breach and, in furtherance thereof, an
> injunction may be granted by any court of competent jurisdiction.  If either
> party to this Agreement brings an action to enforce the terms hereof or
> declare rights hereunder, the prevailing party in any such action shall be
> entitled to recover its, his or her reasonable attorneys' fees from the other
> party as fixed by the Court.

23.     In his capacity as an investment banker for Houlihan, Wasik had access to

vast amounts of Houlihan's proprietary information, as defined in the Agreement.  In that same

capacity, Wasik was able to develop close relationships with key companies in Houlihan's client

base.  Wasik was also in a position to evaluate and establish relationships with many of

Houlihan's personnel, including valuable members of the financial staff.

24.     The proprietary information to which Wasik had access as an investment

banker at Houlihan constituted trade secrets of Houlihan's and was invaluable.  Were it not for

his employment with Houlihan, Wasik would not have had access to any of that information.

C.     Wasik's Resignation from Houlihan to Join Jefferies

25.     In early 2007, Houlihan told Wasik that it had concerns about his

performance and suggested to him that either he would need to improve his performance and his

working relationships with others at Houlihan, or he might be best off seeking other

employment.  Houlihan told Wasik that if he decided to leave, Houlihan would give him

sufficient time to find a position elsewhere.  In response, Wasik told his supervisors at Houlihan

that he would improve his performance and modify his behavior, and that he had no intention of

leaving Houlihan.

26.    A few months after those discussions, on or about May 15, 2007, Wasik informed his supervisors at Houlihan for the first time that he was considering alternatives to working at Houlihan. The next day, on or about May 16, 2007, Wasik informed his supervisors that he planned to resign from his position at Houlihan, but that he would agree to meet with Robert Hotz, Houlihan's Co-Chair, the next evening to discuss his employment situation. On or about May 18, 2007, Wasik informed Mr. Hotz that he would likely voluntarily resign from the company, but that he wanted to think about it over the weekend to be absolutely sure. On May 21, 2007, Wasik resigned from his position at Houlihan.

27.    On information and belief, at some time before announcing his resignation from Houlihan, Wasik accepted a Managing Director position with Jefferies that is similar to the one he held at Houlihan. On or about May 28, 2007, Wasik began work at Jefferies, where he is believed to be the head of its consumer products group, as he was at Houlihan before the diminution of his responsibilities in around February 2007.

D.    Wasik's Transfer of Houlihan Proprietary Information
       to Himself and His Solicitation of Houlihan Employees

28.    Before he gave any indication to Houlihan that he intended to resign from the company, and in fact after he assured his superiors that he would remain at Houlihan, Wasik transferred vast amounts of Houlihan proprietary information from Houlihan's computer systems to a personal Macintosh computer, at his home in New Jersey, on which he maintained a personal e-mail account. That transfer of proprietary information was a blatant violation of his obligations to Houlihan under the Agreement.

29.    In all, Wasik forwarded 484 e-mails, many with attachments, in the four weeks before his departure from his computer at Houlihan to the e-mail account on his home computer. The information that he sent to himself included, among many other items of

confidential and proprietary information, some 4,000 names and addresses of Houlihan's business contacts -- an important tool developed by Houlihan to help service its clients and attract new business -- and internal reports and memoranda on existing and prospective clients and transactions.

30.    Houlihan estimates that the volume of documents wrongfully transferred by Wasik would, if printed, amount to approximately 50,000 pages, or enough to fill at least 20 boxes. Wasik's transfer of information included the forwarding of about 275 e-mails -- with attachments containing hundreds of other electronic files, all of which belonged to Houlihan -- to his personal e-mail account between 3:23 a.m. and 5:54 a.m. on May 21, 2007, the effective date of his resignation. He transferred those files, moreover, after he had specifically been instructed by his immediate supervisor on Friday, May 18 not to take from Houlihan any material that was not clearly a personal possession.

31.    Just after Wasik left Houlihan's employ, the company's information technology department discovered Wasik's transfer of e-mails to his personal computer, and Houlihan's General Counsel, Christopher Crain, promptly confronted Wasik about it and demanded that the information be returned to Houlihan. Wasik conceded that he transferred the information, claiming, incredulously, that he was unaware that it was wrongful for him to have done so. He also claimed that he had not printed out the information he transferred to his computer or otherwise made use of it.

32.    In the weeks that followed, after Wasik obtained counsel in connection with his misappropriation of Houlihan's proprietary information and other wrongful acts, Wasik ultimately allowed Houlihan to have a computer forensics firm, Stroz Friedberg, LLC ("Stroz"), gain access to his Macintosh computer and image the computer's hard drive to analyze Wasik's

use of the information. Stroz went to Wasik's home in New Jersey on June 19, 2007 and made

its image. Wasik refused, however, to relinquish the computer itself, enabling him to do

whatever he liked with the information while Stroz conducted its analysis back at its offices.

33.     Despite Wasik's repeated insistence in the weeks following his departure

from Houlihan that he had done nothing with the proprietary information he transferred to

himself, Stroz discovered that, on or about June 15, 2007, Wasik downloaded onto the hard drive

of his computer a confidential Houlihan document entitled "M&A Committee Review Form,

[Prospect #1], March 26, 2007."[1] That document discussed, among other things, Houlihan's

efforts to secure the retention by the company in question, Prospect #1, as investment banker for

Prospect #1's proposed spin-off of its non-core U.S. operations. Wasik had been actively

involved in those efforts throughout early 2007, while he was still employed by Houlihan, and

was eager to take that business with him to Jefferies.

34.     Although he allowed Stroz to image the hard drive of his personal

computer, Wasik still maintains access to the information he misappropriated from Houlihan

and, as of the time of this complaint, has not returned any of the information to Houlihan or had

the information destroyed. Facing no effective restraint on his use of that information or its

disclosure to Jefferies, Wasik, on information and belief, has done both in his effort to secure

business that originated at Houlihan or that he otherwise could not get without having had access

to Houlihan's work product.

35.     Wasik's disloyalty to Houlihan did not stop with his misappropriation of

Houlihan's proprietary information. Before giving any indication that he would be leaving

---

[1]     Because the proposed transaction that is the subject of that document is still ongoing and sensitive to the company in question, we refer to the company as "Prospect #1," rather than to its real name, to preserve its confidentiality. For the same reasons, we refer below to certain of Houlihan's clients as "Client #1" and "Client #2."

Houlihan, Wasik also actively solicited several of Houlihan's employees to leave the company and join him at Jefferies. Those employees included members of Houlihan's financial staff and his assistant at Houlihan.

E.     Wasik's Interference with Houlihan's Client
       Relationships and Diversion of Corporate Opportunities

36.     As a high-ranking, highly compensated executive of Houlihan, Wasik at all times of his employment owed Houlihan a fiduciary duty and a duty of undivided loyalty and good faith. Those duties required, among other things, that Wasik place Houlihan's business interests above his own personal interests, and that he refrain from any activity that conflicted with, interfered with, or otherwise undermined Houlihan's interests, including its relations with existing and prospective clients.

37.     By transferring proprietary information of Houlihan's to his personal computer and by soliciting the services of other Houlihan employees for the benefit of another company, Wasik violated his fiduciary duty and duty of loyalty to Houlihan. But he also violated those duties in his dealings with two of Houlihan's clients, referred to here as Client #1 and Client #2, for which he was working in the months preceding his resignation from Houlihan.

38.     Client #1: On or about February 5, 2007, Houlihan was engaged by Client #1, a company in the business of providing products and related equipment for home use, to provide M&A advise in connection with the sale of the company to a third party. Under the parties' engagement agreement, in the event Houlihan were to procure a sale of Client #1, it would be entitled to a fee equal to 1% of a sale price of up to $400 million, and 3% of any consideration received in excess of $400 million.

39.     Wasik was the Managing Director primarily responsible for the Client #1 engagement for Houlihan. But between the time that Houlihan was engaged by Client #1 and the

time Wasik departed from Houlihan, Wasik managed this engagement in such a way as to undermine the relationship between Client #1 and other Houlihan professionals. As evidenced by subsequent events, Wasik appears to have tried to establish himself as the only senior professional who could execute the Client #1 engagement to completion. Mr. Hotz has been informed, and Houlihan believes, that before Wasik left Houlihan or even told his superiors there that he was leaving, he asked Client #1's representatives on or about May 14, 2007 to alter Client #1's contract with Houlihan and co-engage Jefferies. Wasik's proposed modification of Houlihan's engagement would have substantially reduced the fees to which Houlihan would have been entitled.

40.    Client #1 declined Wasik's request. But it became upset with the disruption to the sale process occasioned by Wasik's departure from Houlihan and his attempts to interfere with Client #1's contractual relationship with Houlihan. In addition, Client #1 incorrectly assumed that senior Houlihan officers knew of Wasik's plan to leave Houlihan, asserting that Houlihan should have been the one to inform it of Wasik's departure, with a plan in place to manage the transition of the assignment to a new senior investment banker and to ensure that the sale process proceeded smoothly and without interruption.

41.    Client #1's assumption that Wasik would inform Houlihan of his resignation before he informed clients, and Client #1's expectation that Houlihan would manage the transition, were both reasonable. But Wasik's actions, unfortunately, prevented those things from taking place. Because Wasik did not inform Houlihan before May 15, 2007 that he had any intention of leaving the company, and did not formally resign until May 21, Houlihan had no reason to believe that Wasik would be leaving before he solicited Client #1's business for a

competitor of Houlihan's. Houlihan therefore had no reason to inform Client #1 of Wasik's

departure or to transition the assignment before then.

42.    To retain its relationship with Client #1, Houlihan was forced to make

significant concessions to Client #1 as to the terms of their engagement. In particular, Houlihan

agreed to reduce its fee from 1% to 0.55% on a sale price of up to $400 million for the sale of

Client #1. Assuming Client #1 is ultimately sold for $400 million (which Houlihan considers the

low end of likely outcomes), Houlihan's fee will decline from around $4 million to around $2.2

million, a loss of $1.8 million. Were it not for Wasik's misconduct, there is no reason to believe

that Houlihan would have had to make that concession and thereby incur that loss in fees.

43.    Client #2:  In June 2006, Houlihan became engaged by Client #2 as M&A

advisor for Client #2's sale of the company to a third party. Wasik was the banker responsible

for dealing with Client #2, which develops and engages in multi-channel marketing of a variety

of consumer products.

44.    In egregious violation of his obligations to refrain from acting in a way

inimical to Houlihan's business interests, Wasik repeatedly maligned Houlihan to Client #2's top

officers and tried to steer Client #2 away from Houlihan and to Jefferies.

45.    As an example, in a May 15, 2007 e-mail from Wasik's Houlihan e-mail

account to the individual who upon information and belief is Client #2's Chief Financial Officer,

Wasik wrote the following: "I am beyond frustrated with Houlihan. I have lost all confidence in

them doing what they say they are going to do in a timely fashion. If you need to act quickly

then I understand if you have to go elsewhere, I am just tired of giving excuses for them and

losing more and more of your goodwill." Later, in the same e-mail, Wasik wrote, "I can not let

them [Houlihan] hurt my relationship with you anymore." At the time of that correspondence,

Wasik was still an employee of Houlihan, and it was Houlihan, not Wasik, that had a contractual relationship with Client #2. Upon information and belief, Wasik, while still employed by Houlihan, made further disparaging remarks about the company to Client #2's top officers.

46.    Although Wasik's disparagement of Houlihan rested on untrue or misleading accusations, Houlihan has been informed and believes that Wasik's statements nonetheless led Client #2 to sever its relationship with Houlihan. That Wasik diverted Client #2 to himself is evidenced by a May 14, 2007 e-mail to Client #2's same representative, in which he wrote: "I got the ok from attorneys yesterday, we are all set. I will fax to you when I get it. I am officially a new person tomorrow and can get the new contract to you. . ." As a result of Wasik's diversion, Houlihan was deprived of the investment banking fees that it would otherwise have been able to earn on the transaction. Those fees would have been a minimum of $900,000 under the engagement letter agreement between Houlihan and Client #2.

47.    In addition to Client #1 and Client #2, Wasik is believed to have solicited other existing or prospective clients of Houlihan's to follow him to Jefferies. Prospect #1 is one example, as evidenced by Wasik's download of the Prospect #1 document, referred to above, to his personal computer on June 15, 2007. Houlihan had previously invested substantial resources to secure Prospect #1's engagement, all while Wasik was still employed by Houlihan.

F.    Wasik's Last-Minute Rejection of an Extensively Negotiated
     Resolution of the Claims to Which His Misconduct Gave Rise

48.    Once Houlihan learned of Wasik's transgressions, it made clear to him that it would seek to enforce the legal claims that it had against him, but offered him the chance to resolve the matter amicably and without judicial intervention. Wasik retained counsel, and the parties then engaged in settlement discussions for a full two months, from late May to late July.

- 15 -

Houlihan's General Counsel, Christopher Crain, spearheaded the discussions, evidencing the seriousness with which Houlihan viewed Wasik's contractual and fiduciary breaches.

49.     By the fourth week of July, after the parties' counsel had spent some six weeks extensively negotiating the terms of a written settlement agreement, the parties appeared to have reached a deal.  On the afternoon of July 24, however, Wasik, through his counsel, suddenly declared that he was rejecting the settlement and would not be signing the settlement agreement.  During the next two weeks, Houlihan made various final efforts to resolve this matter without litigation.  But those efforts were ultimately to no avail, and Houlihan has accordingly been left with no choice but to enforce its rights by way of this lawsuit.

FIRST CAUSE OF ACTION
(Breach of Contract for Disclosure of Proprietary Information)

50.     Houlihan repeats and realleges the allegations of paragraphs 1 through 49 of this complaint as though fully set forth herein.

51.     Wasik's transfer of proprietary information of Houlihan's to his personal computer constituted a breach of the Agreement, and specifically of Section 2 of the Agreement, entitled "Nondisclosure of Proprietary Information."  Wasik is believed to have further breached Section 2 of the Agreement by disclosing that information to Jefferies and/or to have used the information to pursue Houlihan's clients or prospective clients.

52.     As a result of Wasik's breach of contract, Houlihan has incurred economic damages in an amount that cannot presently be quantified but will be determined at trial. Wasik's breach has also caused, and continues to cause, Houlihan irreparable harm necessitating preliminary and permanent injunctive relief.

SECOND CAUSE OF ACTION
(Misappropriation of Confidential Proprietary Information)

53.    Houlihan repeats and realleges the allegations of paragraphs 1 through 52 as though fully set forth herein.

54.    The information of Houlihan's that Wasik transferred to his personal computer was confidential and proprietary and of the kind that is critical to the operation of Houlihan's business and the servicing of its clients.  Were it not for his having been employed by Houlihan, Wasik would never have had access to any of Houlihan's proprietary information, including that which he transferred to himself.

55.    The proprietary information that Wasik misappropriated was developed solely for Houlihan's use and benefit.  As reflected by Houlihan's employment contracts, including the Agreement, the information was to be kept strictly confidential, was never to be disclosed to anyone outside Houlihan, and was at all times to be solely within Houlihan's control.  Wasik never asked for, and Houlihan never gave him, permission to disclose the misappropriated information to himself, Jefferies or anyone else.

56.    The only conceivable purpose that Wasik could have had in transferring Houlihan's proprietary information to himself was to use the information to pursue corporate opportunities at Jefferies in competition with Houlihan.  Upon information and belief, Wasik has been using, or intends to use, the misappropriated information for just that purpose, to the detriment of Houlihan.

57.    Wasik's misappropriation of Houlihan's proprietary information was intentional, willful and malicious.  It has caused Houlihan economic damages in an amount that cannot presently be quantified but will be determined at trial.  It has also caused, and will

- 17 -

continue to cause, Houlihan irreparable harm necessitating preliminary and permanent injunctive relief.

58.    Houlihan has no adequate remedy at law.

### THIRD CAUSE OF ACTION
(Violations of Computer Fraud and Abuse Act, 18 U.S.C. § 1030)

59.    Houlihan repeats and realleges the allegations of paragraphs 1 through 58 as though fully set forth herein.

60.    In violation of 18 U.S.C. § 1030(a)(4), Wasik deliberately accessed Houlihan's computer system, downloaded confidential and proprietary information contained on that system, and transferred that information to his own personal Macintosh computer at his New Jersey home, on which he maintains a personal e-mail account.

61.    Wasik downloaded and transferred Houlihan's proprietary information for purposes of competing against Houlihan, in breach of his contractual obligations, fiduciary duty and duty of loyalty to the company.  Wasik's accessing of Houlihan's computer system under those circumstances was impermissible and otherwise exceeded the scope of his authorization, in violation of 18 U.S.C. § 1030(a)(4).

62.    Further, in violation of 18 U.S.C. § 1030(a)(5)(A)(ii), Wasik's unauthorized accessing of Houlihan's computer system caused damage to Houlihan, impairing the integrity of its computer system and of the illegally obtained proprietary information.  It also resulting in Houlihan's having to retain, at considerable cost, a computer forensics expert to image the hard drive of Wasik's home computer and analyze his use of the misappropriated information.

63.    As a result of Wasik's misconduct, Houlihan has suffered damages exceeding $5,000.

## FOURTH CAUSE OF ACTION
(Breach of Fiduciary Duty and Duty of Loyalty)

64.     Houlihan repeats and realleges the allegations of paragraphs 1 through 63 as though fully set forth herein.

65.     Throughout his employment with Houlihan, Wasik owed the company a fiduciary duty and duty of undivided loyalty and good faith.  Wasik violated those obligations in multiple ways:  by transferring Houlihan's proprietary information to his own personal computer; by soliciting, or otherwise encouraging, various Houlihan employees, including members of its financial staff, to leave the company to join him at Jefferies; by baselessly disparaging Houlihan to at least two of its clients (Client #1 and Client #2), causing Houlihan to lose one of those clients and to make concessions to the other estimated to be worth a minimum of $1.8 million; and by seeking to divert from Houlihan to Jefferies the business opportunities presented by those same two clients, as well as opportunities presented by at least one and probably multiple other prospective clients.

66.     Each of those breaches of loyalty was characterized by Wasik's having placed his own personal interests, as well as those of Jefferies, above the business interests of his employer at the time, Houlihan.  As a result, Houlihan has incurred substantial damages, including an estimated $1.8 million or more on the concessions it was forced to make to Client #1, and another $900,000 on the loss of Client #2 as a client.  Houlihan has incurred other economic damages that cannot be quantified at this time but are believed to be considerable.

67.     Wasik's breaches of his fiduciary duty and duty of loyalty have also caused, and will continue to cause, Houlihan irreparable harm necessitating preliminary and permanent injunctive relief.

FIFTH CAUSE OF ACTION
(Misappropriation of Corporate Opportunities)

68.    Houlihan repeats and realleges the allegations of paragraphs 1 through 67 as though fully set forth herein.

69.    As set forth above, Wasik undertook to divert to Jefferies the business opportunities that Houlihan had had with Client #1 and Client #2.  Upon information and belief, Wasik similarly undertook to divert to Jefferies other business opportunities with which he was involved while he was employed at Houlihan, or that otherwise came to his attention through his employment at Houlihan.  All such diversions were designed to benefit Wasik and Jefferies at Houlihan's expense.

70.    Houlihan was fully able to service for the clients in question all of the corporate opportunities that it knows Wasik diverted, since the services called for were a regular part of Houlihan's business.  Houlihan has no reason to believe that it could not have serviced any other corporate opportunities that Wasik may have diverted or tried to divert.

71.    Wasik's misappropriation of corporate opportunities has caused Houlihan economic damages in an amount that cannot presently be fully quantified but total at least $2.7 million, as set forth above.  It has also caused, and will continue to cause, Houlihan immediate irreparable harm necessitating preliminary and permanent injunctive relief enjoining Wasik from soliciting those existing and prospective clients of Houlihan's with which Wasik dealt before his departure from Houlihan, and about which Wasik possessed confidential and proprietary information.  Houlihan has compiled a partial list of such clients, whose identities are confidential, that can be provided to the Court.

72.    Houlihan has no adequate remedy at law.

- 20 -

<u>SIXTH CAUSE OF ACTION</u>
(Breach of Contract for Misappropriation of Corporate Opportunities)

73.    Houlihan repeats and realleges the allegations of paragraphs 1 through 72 as though fully set forth herein.

74.    Wasik's diversion of Houlihan's corporate opportunities, described above, constitutes a breach of Section 5 of the Agreement, entitled "Conflicting Employment; Business Opportunities." That breach has caused, and will continue to cause, Houlihan irreparable harm necessitating preliminary and permanent injunctive relief. It has also caused Houlihan economic damage in an amount that cannot presently be fully quantified but total at least $2.7 million, as set forth above.

75.    Houlihan has no adequate remedy at law.

<u>SEVENTH CAUSE OF ACTION</u>
(Tortious Interference with Contractual Relations)

76.    Houlihan repeats and realleges the allegations of paragraphs 1 through 75 as though fully set forth herein.

77.    Houlihan had valid engagement agreements with Client #1 and Client #2 to provide investment banking services. By intentionally disparaging Houlihan to those clients, encouraging them to sever or alter their relationships with Houlihan, and engaging in other wrongful acts described above, Wasik wrongfully interfered with those agreements to Houlihan's detriment.

78.    In particular, Wasik caused Client #1 to require that Houlihan modify the original terms of the parties' engagement by drastically reducing the fee to which Houlihan is entitled for its services. Wasik caused Client #2 to terminate its engagement with Houlihan altogether.

- 21 -

79.     As a result of his interference with Houlihan's engagement agreements with Client #1 and Client #2, Wasik is liable to Houlihan, for tortious interference with contractual relations, for damages in an amount to be determined at trial but in no event less than $2.7 million.

EIGHTH CAUSE OF ACTION
(Return of Compensation Under the Faithless Servant Doctrine)

80.     Houlihan repeats and realleges the allegations of paragraphs 1 through 79 as though fully set forth herein.

81.     Under the doctrine of faithless servant, Wasik forfeited all of his rights to compensation from Houlihan from the date he committed the first of the multiple breaches of loyalty and fiduciary duty described above.  Until it has conducted discovery, and particularly the deposition of Wasik, Houlihan is unable to determine exactly what that date is.

82.     In all events, Wasik's compensation was substantial.  For Houlihan's 2006 fiscal year, covering the fifteen-month period between January 1, 2006 to March 31, 2007, the company paid Wasik more than $1.5 million, of which more than $1.3 million was paid in cash as a bonus on April 30, 2007.  Depending on when Wasik is found to have first breached his duty of loyalty to Houlihan, Houlihan's recoverable damages could be substantial, encompassing that bonus payment.

83.     Wasik is accordingly liable to Houlihan for damages equal to all compensation -- including salary and any bonus, in cash or stock -- that Houlihan paid to him for the period beginning on the date on which he is found to have first breached his fiduciary duty and duty of loyalty to Houlihan, and ending on his resignation from Houlihan on May 21, 2007.  All such compensation must be disgorged by Wasik and returned to Houlihan.

## NINTH CAUSE OF ACTION
### (Breach of Contract for Wasik's Failure to Pay His Promissory Notes)

84.     Houlihan and HLHZ repeat and reallege the allegations of paragraphs 1 through 83 as though fully set forth herein.

85.     During his employment at Houlihan, Wasik issued two separate promissory notes to HLHZ, and one to Houlihan, in return for loans that the companies extended to him.  The notes consist of (i) a May 25, 2006 note issued to Houlihan in the principal amount of $200,000, whose entire balance of principal and accrued interest was due and payable on April 30, 2007; (ii) a June 1, 2006 note issued to HLHZ in the principal amount of $345,000, whose entire balance of principal and accrued interest became due and payable upon Wasik's resignation from Houlihan, which was effective May 21, 2007; and (iii) a June 1, 2006 note issued to HLHZ in the principal amount of $36,688.75, whose entire balance of principal and interest likewise became due and payable upon Wasik's resignation from Houlihan.

86.     Despite repeated promises to do so, Wasik has failed to pay the balance due on any of the foregoing three promissory notes.  As of August 2, 2007, the combined balance of principal and interest due on the notes was $483,178.19.

87.     Houlihan and HLHZ are accordingly entitled to damages, for Wasik's breach of his payment obligations under his promissory notes, in an amount to be determined at trial but in all events exceeding $483,178.19.

## TENTH CAUSE OF ACTION
### (For Attorneys' Fees Incurred in Enforcing the Agreement and Promissory Notes)

88.     Houlihan and HLHZ repeat and reallege the allegations of paragraphs 1 through 87 as though fully set forth herein.

- 23 -

89.    In addition to injunctive relief and compensatory damages, Houlihan is also contractually entitled to its attorneys' fees incurred in enforcing its rights, and Wasik's obligations, under the Agreement.  As stated in Section 9 of the Agreement, "[i]f either party to this Agreement brings an action to enforce the terms hereof or declare rights hereunder, the prevailing party in any such action shall be entitled to recover its, his or her reasonable attorneys' fees from the other party as fixed by the Court."

90.    Houlihan and HLHZ are also entitled to their attorneys' fees incurred in collecting on each of Wasik's three promissory notes.  As each note states, "Maker [Wasik] agrees to pay all costs and expenses of collection, including attorneys' fees, in the event this Note is not paid when due and whether or not suit is filed."  Having failed to pay the notes when they became due, Wasik is thereby obligated to pay Houlihan's and HLHZ's attorneys' fees and other expenses incurred in collecting on the notes.

91.    Wasik is accordingly liable to Houlihan and HLHZ for the attorneys' fees, in an amount to be determined at trial, that they have incurred and will continue to incur in enforcing Wasik's obligations under the Agreement and under his three promissory notes.

WHEREFORE, Houlihan respectfully requests that the Court enter an order granting Houlihan equitable relief against Wasik, and Houlihan and HLHZ demand judgment against Wasik for compensatory damages, as follows:

a    On the first through sixth causes of action, granting Houlihan a temporary, preliminary and permanent injunction (i) compelling Wasik to return immediately to Houlihan all of the documents and other information that he took from the company; (ii) granting Houlihan's computer forensics expert immediate access to the personal computer to which he sent himself Houlihan's proprietary information, thereby enabling the expert to expunge the

information; (iii) preventing Wasik from using the misappropriated property, and any other proprietary information of Houlihan's, in any way; (iv) preventing Wasik from disclosing any of Houlihan's proprietary information to Jefferies or any other third parties; (v) prohibiting Wasik from pursuing those corporate opportunities with Houlihan's existing and prospective clients that he dealt with while he was employed by Houlihan or about which he has confidential and proprietary information obtained from Houlihan; and (vi) prohibiting Wasik from soliciting Houlihan's employees;

       b.     On the first, second and third causes of action, awarding Houlihan compensatory damages in an amount to be determined at trial;

       c.     On the fourth, fifth, sixth and seventh causes of action, awarding Houlihan damages in an amount to be determined at trial but in no event less than $2.7 million;

       d.     On the eighth cause of action, for an order requiring Wasik to disgorge to Houlihan all of the salary, bonus and other compensation paid to him, in an amount to be determined at trial, during the period in which he was in breach of his fiduciary duty and duty of loyalty to Houlihan;

       e.     On the ninth cause of action, for compensatory damages to Houlihan and HLHZ in an amount to be determined at trial but in all events exceeding $483,178.19;

       f.     On the tenth cause of action, for the attorneys' fees, in an amount to be determined at trial, incurred by Houlihan in enforcing its rights under the Agreement, and incurred by Houlihan and HLHZ in enforcing their respective rights under Wasik's promissory notes;

       g.     For punitive damages in an amount to be determined at trial;

       h.     For pre-judgment interest, on each of Houlihan's claims for which it seeks

compensatory damages, in an amount to be determined at trial; and

       i.     For such other relief as the Court deems just and proper.

      Houlihan demands a trial by jury on all of its claims to which it has that right.

Dated:     New York, New York
          August 6, 2007

                     LEVI LUBARSKY & FEIGENBAUM LLP

                     By: _____

                         Steven B. Feigenbaum (SF-1711)
                     1185 Avenue of the Americas, 17th Floor
                     New York, New York 10036
                     (212) 308-6100
                     Attorneys for Plaintiffs Houlihan, Lokey,
                     Howard & Zukin, Inc. and HLHZ Investments, LLC